Good morning, Your Honor. May it please the Court, my name is Michael Doyon. I am here representing the defendant, Richard Berger. The Court's ex-party instructions... I'm always curious, maybe it doesn't matter if you were the trial attorney or not in this case. Yes, I was, Your Honor. Okay. It may be the first time I haven't gotten past a statement of my name before I got a question. The trial court's instruction, ex-party instruction in this case that the jurors were to reconsider their positions and otherwise, if they failed to do that, that would be acting like the Hatfields and McCoys and would not be conducive to a final conclusion was coercive. That instruction never should have been given. Such an instruction never should have been given in the absence of counsel and the defense. Had counsel been present, it's clear on the record presented that the instruction would not have been given. It is therefore impossible to say that the instructions... Well, you're just... I'm sorry, go ahead. You're just taking that out of context, aren't you? I mean, Judge Takasugi went in there, talked to these folks, the whole colloquy, and told them that if they held a certain opinion and it was based on the evidence and their interpretation of it, I'm just paraphrasing, that that was fine. They could stick to it. He went... So, you're just taking that out of context. Your Honor, I am focusing on a particular aspect of the instruction that we believe is coercive, we believe never would have occurred had counsel been present. It is clear that it violated the defendant's right to be there. Okay, but counsel all stipulated the judge could go in there. Absolutely, Your Honor. All right, so you have that one sentence, and then later on he gave the instruction that you offered. Correct, Your Honor. All right. We believe there is nevertheless a violation of presence for the following reason. The court stated unequivocally it would not give an Allen instruction. It went in, it did. When the court came back, the court stated, I departed from the script. That conclusion is correct. We can study the transcript as much as we want. The court gave a preview of what it wanted to say. After much discussion with counsel as to what it would say, the court went in, gave the Allen instruction, came back, said I departed from the script. That finding is correct. It is certainly not clearly erroneous, and therefore cannot be set aside. So I would posit to the court, we clearly have a case where there was a violation of the right of presence. That is the finding of the district court. We don't have a case where the district court said, oh, yes, you gave me permission to say everything I went in there. We have exactly the opposite, a court coming back out and saying, I departed from what we agreed I would say. And we would submit on the presence. Go ahead, Your Honor. Is it a harmless error, then? I mean, you're saying it was error. I believe that is the sole question on the presence issue, Your Honor. I believe it's clear there was a violation. And then the question is, has the government shown beyond reasonable doubt that it was harmless error? And let me tell you why I think the government hasn't made that showing and why they can't make that showing. And part of that has to do with the nature of the language that the court used and the way it was directed in the jury room. I believe there are two coercive aspects of this instruction that created a clear risk of coercion. That is all we would need to establish to show that you cannot say beyond reasonable doubt that there was no prejudice from what occurred in the jury room. On the presence issue, I do not have to show that the instruction violated this Court's standards for the Allen charge, although I respectfully submit that it did, and we'll argue that, but I don't have to show that in order to establish that the government has demonstrated or has not demonstrated that the error was harmless beyond reasonable doubt. Let's go back for a second to what's wrong with this Allen charge. Even, Your Honor, if you take it all in context and everything he said to the jury, he says, well, we can't ask you to do much more than being sincere. He doesn't say we can't ask you any more than being sincere. He says if you're sincere, we can't ask much more than that. And then he went on to say, you should reconsider your position. It wouldn't be wrong for you to reconsider it if you can be convinced that perhaps your position was not accurate or that it could be wrong. You have to have that state of mind, he said, otherwise it's going to be like the Hatfields and McCoys. It's not going to be promotive of a final conclusion. No such language occurs in any approved Allen charge ever. That violates one of the most fundamental precepts for an Allen charge. They not express any criticism of the jury or the jurors' inability to reach agreement. We can urge them to try and listen to each other and see if they can't come up with a conscientious decision, but we cannot give them what this Court has called a lecture sounding in reproof. We may not suggest that there is anything wrong for the jurors to be unable to reach agreement. We may not suggest to them that there is anything wrong for a juror to cause a mistrial. That is a bona fide and lawful outcome of a proceeding, and the jurors cannot be criticized for the fact that that's what's happening. And to do that is clearly coercive, and more coercive than the instruction in Allen. Roberts. So you want a retrial? Is that what you're seeking? Yes, Your Honor. We believe the case will be retried. And then you've got the — that would be with regard to the 12 counts of conviction. Then you've got all the other counts of hung jury. I don't know what the status of that is. Those cases — those charges were dismissed, I believe, without the courts. We're only talking about the 12 counts of conviction. That is correct, Your Honor. The other respect, Your Honor, in which this instruction is coercive is that it is clearly directed at a single juror. Before Judge Tagasugi — and let me go through the record on that, because I think the record's quite clear. I don't think the brief is that clear on this point. Before the judge went in to talk to the jury, when he was talking to counsel, he said, Juror Rue is under a lot of heat. She's expressing pressure. She appears to be expressing pressure from the position she's taken. He had surmised that from what evidence he knew. He says that on the record in the colloquy with counsel. When he goes in to talk to the jurors, her remarks tend to confirm that. She is the only juror who says there are people who are dead set on both sides of this issue. He was talking about under — she was under heat because of child care considerations. He — he said that she was raising the point of wanting days off because she was experiencing heat in the jury room, she wanted relief from that heat. He thought because of the pressure, because of the position she was taking in the jury room. That is the conclusion he reached and stated on the record before he went in there. She wants some time off, but the reason she wants some time off is she's feeling pressure because of the position she's taken. Scalia. How would he know that? Waxman. Sorry? Scalia. How would he know that? Waxman. Your Honor, when there was some colloquy on that, he talks about hearsay. He's hearing from the staff as to the outbursts that are coming out of the jury room. He makes specific reference to there being emotional outbursts and there being a need to intervene on that basis. And he knows that she is requesting time off and may well know, for all we know, who the — who the outbursts were coming from.  Could have been someone else. Waxman. We do not know that, Your Honor. We do know that based on the information available to him, that was the surmise that he reached, which is a relevant consideration under this Court's case law. We never know what jurors are actually thinking. We forbid ourselves from asking and factoring that into the analysis. So what we are always doing is dealing with the surmises of the court and the parties. When he went in, she was the only juror who said, I've made up my mind and I'm not going to change my vote. Nobody else said that. When the judge came to giving this Allen instruction at the end, he directed it to the jurors. He says, with respect to those of you who have reached a particular conclusion in that, you will not change your mind. And then he says, you should reconsider your position. If you don't do that, you're acting like the Hatfields and McCoys and we won't have a final conclusion. Well, there was only one juror in there who said they had made up their mind and not going to change it. That was Juror Rue. When the court came out and described to counsel what had happened on the record, the judge said, well, a juror or maybe several jurors blurted out spontaneously that they made up their mind, they're not going to change it, and in response, I said you should reconsider. So the judge came out and said he responded to the juror blurting something out. Only one juror blurted something out. That was Juror Rue. The judge understood that he was responding to that comment. Well, he's saying here, the court, okay, one thing I would like to comment on. I don't know if I should or not. But with respect to those of you who reached a particular conclusion and that you will not change your minds, it wouldn't be wrong for you to reconsider your position if you can be convinced that perhaps your position was not accurate, that it could be wrong. And you have to have that state of mind throughout deliberations, or that's to keep an open state of mind. Otherwise, it's going to be like the Hatfields fighting the McCoys. It's not going to be promotive of a final conclusion, as long as you understand that. Now, so he's telling them that they need to, in a sense, keep an open mind. If their position was not accurate, they should reconsider it. If you can be convinced that it's not accurate. And he doesn't know how the jury stands one way or another. And I don't see if there's anything there where he's telling them that they must reach a verdict. Maybe I'm not, you know. Your Honor. Where does he say it's not going to be promotive of a final conclusion? Well, that could be where they reach a verdict, or you could have a final conclusion where they could go one way or another. Or you can even have a final conclusion, I suppose, if they hang up. Your Honor, there are two points we would make about that. The language that says not reconsidering your position, not being prepared to do that, not reaching a final conclusion is like the Hatfields and the McCoys. The most famous feud in American history, lasted 30 years, resulted in 13 murders, is to be critical of the jurors who are not deciding. I didn't know it was the most famous feud in American history and resulted in how many murders? 13, Your Honor. 13. I thought they were fighting over whiskey. I think they fought over a lot of things for 30 years. And just before the judge had indicated a comment that you read, the foreperson indicated that, when asked the status, that the jury still had not received all the evidence and therefore could not say we're stuck on things. Rather, everything is still undecided completely. And then I think the judge made the comment that you read. Correct, Your Honor. But that is why we say it's focused on Juror Rue. She is the only one indicated. She has made her mind up. She is not going to change her mind. And this comment here would be understood by everyone in the room to be a response to what she said. Not some abstract comment to the juror in general. He said, for those of you, and then used the language that she did. But then another juror's. Not going to change it. But she says that pretty much I do. We all have our set minds pretty much. She goes right down beyond that at the end of that page and carrying over, Your Honor, to say you could leave me in here for 100 years, right, and I carry over a page and I will not change my vote. A hundred years and I will not change my vote. No other juror made such an assertion. But one juror said, I hope we'll be done by September 15th or I'll jump out this window. That is correct, Your Honor. That was another juror that said that. I certainly didn't want to be in the room that long. But there's no one else suggesting they are in that position. The very juror that the judge surmised was feeling heat for the pressure she was under. Let me go back to my basic point, Your Honor. We still don't know what she was thinking, or whether she was going one way or the other way. We would never know that, even in cases where we talk about the judge having conducted a survey of who thinks deliberations would be more useful and wouldn't, and there's only one that's left. We don't actually know that that juror decided was the holdout vote. We do not know that. We forbid ourselves from knowing that. And under the present standard, which is what we've got to work with here, the question is, can the government show that beyond a reasonable doubt, this had no impact on juror room, that she wasn't the holdout juror, that this had no effect on her and instruction directed specifically to her and being critical of the juror if they couldn't reach a decision. That's the question. Beyond a reasonable doubt, can we say this had no impact? And I submit that is impossible to say. No case would suggest you could say such a thing. And the case, and I do believe the record makes very clear, that had counsel been present, this instruction would not have been given. The judge said he wouldn't give such an instruction. He clearly wouldn't have given an erroneous instruction like this that used language that just comes out of nowhere if he had consulted with counsel and said, I really think we need an Allen instruction. This would not be the form of it. So the question is, can we say beyond reasonable doubt that this had no effect? The government doesn't even try to address that. Kennedy. So then he gave the curative instruction that you drafted. He did, Your Honor. That curative instruction did not address, and I would submit could not address, the moral condemnation, the suggestion that there's something wrong in doing this. The judge goes into chambers and says up close and personal, if you can't reach a resolution, it's like the Hatfields and McCoys. And we struggle So there's no way in the world that that could be corrected. You know, I don't think the Court has to reach that question. The only thing that the Court has to say is, we didn't find a way. I read what you wrote out. It sounded pretty good to me. We did not find a way to address that question, and I don't think that instruction can be read or construed as having solved that problem, certainly beyond reasonable doubt, which is the standard. Did you tell Judge Takasu, well, I'm giving you this, but I don't think there's any way in the world that that terrible thing you did can be erased? I believe, Your Honor, that is what we did. We came in. We moved for a mistrial. We said, and I think our diagnosis was exactly correct, you've given the worst parts of the Allen charge incorrectly and not the best parts, and we think a mistrial is now required.  That's not the worst part of the Allen instruction. That may be a matter of judgment and argument, Your Honor, but that's hyperbole. I mean, you've got the Allen instruction talking about expense and time and how important it is to bring this thing to an end, and there's no question that another group of jurors, if they're brought in here, will face the same problems that you'll face. And then, you know, it's getting expensive and all this and that. So the Allen instruction has got a lot of stuff in there. I used to use the Allen instruction. I don't think there's any question, Your Honor, that we have preserved our objection to the instruction that was given and that the curative instruction neither spoke to the moral condemnation. I used the modified form. There's also no way of knowing, for example, whether the jury had already reached a verdict in between the time that the judge gave the improper instruction and we were able to come in with a proposed curative instruction. Beyond reasonable doubt, the government cannot possibly say that the curative instruction just took care of all the ills. And they don't even argue that in their briefs. I really want to turn to one quick point on the restitution order because I'm going to run out of time, and I want a little bit of rebuttal, especially because I got across a few of these. Well, I'll tell you this. You have a very good voice. My law professor would say that you have an affidavit voice. Thank you, Your Honor. It's a very valuable trait, you know. It increases the hourly billing. I will remind Mr. Berger of that. Your Honor, on the restitution, I don't think the brief really comes — makes this clear enough to the Court how wrong this calculation goes from the very beginning. And indeed, in my view, I think we spent far too much time talking about the details of all the ways it went wrong, which this Court doesn't ultimately need to reach. It only would have to remand in the event that the conviction was confirmed. The government's theory and the Court's theory below was that for a certain number of borrowing-based certificates, there had been a fraud with respect to what's called B inventory. Mr. Berger had overstated the amount of B inventory he had. The credit limit only allowed him to borrow $1 million max on B inventory. That's all he could ever borrow. And there's no allegation he ever borrowed any more than that. So if he overstated B inventory by $1 million or $10 million or $100 million, it would make no difference beyond the million dollars that he could borrow. And there's no allegation he ever went above that. Indeed, the government's theory was that it was only overstated to the extent of about $600,000 worth of borrowing that he got from that. That could not cause $3 million worth of losses. It is impossible. It didn't. Even accepting everything the government says, we're obligated to do and prove, what they proved was that he was overdrawn by $600,000 on this line of credit that couldn't go above a million for B inventory. And he could only borrow more money on B inventory later if he paid that off and then borrowed it back again. But he could never go up to $3 million. So you could never, ever get to an award like that. The court should have started with how much money did Mr. Berger manage to obtain? That number was known precisely by the government. It's in the record. They put that to the jury. They knew to the dollar, $635,000 in changes was how much money he got as a result of this at one point and calculate the loss from that. Yeah, the bottom line here, if you look at this, Judge Takasugi gave your client a very light sentence, six months. They give welfare mothers that take a check for a few hundred dollars and that's a lot more time than that. The only question is, I'm not going to speak to the sentencing issue first. I'm going to hear what Mr. What the government has to say on that. We obviously didn't appeal the sentence. We solely appealed the restitution. That's the only issue on which we were leading the party. In your opinion, the most restitution should have been a million or $630,000? Well, you then have to do some calculations. It couldn't have been more than the government claimed was borrowed. That turned out to be $635,000. I used the million just because that is the credit limit. The most the government could have got to if they said all the B inventory was fraudulent and he borrowed all of it was a million. They didn't claim all the B inventory was fraudulent, just some of it. And therefore, $635,000 was what he got out of it, how much he borrowed, and they should have calculated losses based on that. I'm sorry. Am I to understand that you're saying that if he had told the truth on every occasion on these reports, these what, the daily, whatever? It's the daily borrowing-based certificate. Yes, Your Honor. That he would have been able to borrow all that he borrowed except $600,000? That is the most. There are several different BBCs the government makes its theory, and the other ones have a lower number. That is correct, Your Honor. That is the most the government showed was that if he had made correct statements and everything he said, $635,000 was all the decrease would have been. Now, do we have any evidence that if the lending institution was not lending on the B inventory, it would have had any impact on any of the other loans, on the other inventory? No, Your Honor. It's quite clear in the government's brief that there are separate components. You can borrow on your account receivable, you can borrow on your A inventory, you can borrow on your B inventory, only up to a million dollars. All right. So you say that the lending institution would have parted with the same amount of money, minus $635,000, if he had told the truth on every occasion? That is absolutely correct, Your Honor. I think it's undisputed. And therefore, we should at least start with that when we say, what's the loss? Then I think you have to do a bunch of things, which the brief discusses, to figure out how much was repaid. If he had told the truth on every occasion, and there'd been no cooking of the books, or whatever you want to call it, how much would the, well, if he'd told the truth on every occasion, the lending company probably wouldn't have given him any money. No, Your Honor, that's not correct. Because he's just telling, he's saying, I have half a million dollars worth of B inventory, for real. I really have that. I'm going to add a million dollars that I don't have at all. OK? I get $600,000 out of that, because you could borrow only 65% of your inventory. When you borrow it, you've got some security behind it, too. That is, the B inventory is the security, Your Honor. The B inventory is the security. That's absolutely correct. That's why it affects how much I can borrow. Wasn't he putting some junk in with the B inventory? That's the theory, Your Honor, is that the other million dollars that's claimed is junk, and results in his ability to borrow another $600,000. But there's no claim that, as a result of falsely overstating the B inventory, he was able to borrow more in his accounts receivable, or more in his A inventory. And for the counts of conviction, there was not even any allegation that the accounts receivable or the A inventory was overstated. So the borrowing on those parts of the line of credit are perfectly proper, and not caused, in any sense, by overstating the B inventory. None of the accounts receivable, all those reports were honest to a T, huh? I'm sorry, I missed the question, Your Honor. All of the reports on the accounts receivable were honest. For the counts of conviction, correct, Your Honor. The government alleged problems with the accounts receivable on other accounts in which there was no verdict. And the Court did not consider those, and the government's calculation wasn't based on those. The government has suggested here that maybe a restitution order could have been based on that, but they haven't even made a calculation here. Nobody ever has. And I don't think we can affirm this clearly erroneous calculation on the grounds that maybe the government could have come up with some other calculation which they haven't done on some other accounts which weren't proven and weren't accepted by the district judge to justify the very large restitution order in this case. You're way over your time. I am, Your Honor. I will ask for you to respond briefly to what my first of all colleague says. Thank you, Your Honor. I can't see those numbers. May it please the Court. My name is Paul Stern. I'm an assistant United States attorney. I was trial counsel in this case. I hope the Court finds my voice at least moderately mellifluous. I want to address first the... Well, wake me up in about 10 minutes and I'll tell you. Is sleeping a good sign or a bad sign? At least it means I don't want to be using my time. Notwithstanding that, first I want to address the claims that defense counsel focused on, principally the presence argument, the notion that there was a constitutional violation because counsel and defendant were not present at the ex parte colloquy. I would submit first of all that there was no violation of the right to presence because it was waived. Counsel focuses on the remark about the Hatfields and McCoys. As the Court surely has noted, one of the things that the judge pointed out in suggesting that it might be worthwhile for him to meet with the jury without counsel present is that he had heard there were emotional outbursts in the jury room. And he indicated clearly that one of his intentions was to calm people down, to get them to look at the evidence with a rational mind, and also to remind them about the search for truth. We would submit that the scope of the waiver of presence, and there was clearly a personal waiver of presence as well as counsel's waiver, has to be viewed from the standpoint of what the subject matter that was previewed was. That subject matter involved calming the jury down, reminding them what this was all about, a search for truth, as well as addressing scheduling conflicts. Accordingly, counsel should have expected that there could have been remarks about not, don't fight, stop fighting, don't behave as if it's the Hatfields and the McCoys. That's not what jury deliberation is about. We would submit that does not constitute or even come close to constituting an Allen charge. Did they finally get married, the Hatfields and the McCoys? I really don't. I only remember the, the only thing I know about the Hatfields and McCoys is from the Beverly Hillbillies. So I probably have a sanitized version of that. I think it was a descendant of theirs. But in any event, so the notion that because there were emotional, the judge was trying to calm the jury down, that somehow that was a violation of the right to presence makes no sense. The second argument is that there was a violation because the judge assured them that he didn't intend to Allen charge. We would submit that in fact the judge did not give an Allen charge. We set forth our reasons for that. In this court has identified certain characteristic marks of the Allen charge. Among them there has to be a notion that the jury is being pushed to reach unanimous verdicts. Well, in this case, the jury reached unanimous verdicts on 20% of the counts before it. The jury was comfortable returning no verdicts on 21 counts of the co-defendant. The co-defendant who was charged with some of the same offenses as Mr. Berger, and in fact against whom a witness testified, saw that defendant shredding documents saying, I'm going to go to jail on count 30, which was falsifying books and records. And the jury hung on that count against Bonnie Metz. We would submit if there was a pressure to reach unanimous verdicts, the court really needs to consider why the jury was comfortable returning hung verdicts on 80% of the counts. So we don't believe, and not only that, that there are repeated instructions not to rush the verdict, take as much time as you want, and as Your Honor has pointed out, there was the corrective instruction. So there was indeed a waiver of the right to presence. Well, now, absent a waiver, this should never have happened, right? Yeah, I think this Court is clear that absent a waiver, yeah, correct. And on this record, it would not have happened absent a waiver. All right. And given the waiver and the scope of the waiver and the judge's description of what he did by acknowledging that he went beyond the script, he has in effect told us that he has gone beyond the waiver. May I address that? Yes, you may. What I think the judge did here and why this case is distinguished from other cases, for example, United States v. Gypsum Company, or United States v. Frazen, or United States v. Rosales-Gonzalez, is the judge was erring on the side of, I don't, erring on the side of caution. He said, I may have gone beyond the script. He wanted to give, he wanted to make sure that counsel was aware of what had happened. And he immediately provided a transcript and allowed for a corrective instruction, which makes, and that is, that distinguishes this case from Gypsum, which focuses on the giving, in the other cases where there was improper ex parte communications of this sort, defendants don't find out about it until after the record's unsealed, which was not true in this case. But we are faced with, we are faced with, with what we have in the judge having some sense that he, and expressly saying, I went beyond the script and felt either compelled or at least comfortable in trying to unring the bell by the instruction. True? Well, Your Honor, I would submit if you look at what the judge said, he said, I may have gone beyond the script. And then he said, and then in explaining how he may have gone, he said he described it. And he certainly, I think the judge did the correct thing, which was to order up a transcript over the lunch hour. I understand that. But I don't think the judge made a finding that he went beyond the script. I would, I would disagree with that. Well, if I boldly assert that he did, what is your contradiction? My contradiction is if you look at what he stated he was going to do, which included calming the jury down, instructing the jury on the search, what the search for truth means, and as well as addressing scheduling conflicts, everything he did fell within the ambit of that. The search for truth involves the willing, and I would submit that what he told the jury, where he thought he went beyond the script, was he told the jury, perhaps if you find that you are wrong, and you should be prepared to change your views. Now, who wouldn't agree with that if you think that you're wrong? Well, that might be good enough in the presence of lawyers. But we have a situation where we have, first of all, the issue of the right to be present, and the waiver of that right to be present, coupled with the issue of what he said along the lines of what is either characterized as an Allen charge or not. Now, in retrospect, this should never have happened. Do we agree on that, or would you have consented to this as a responsible prosecutor, knowing that the judge was going to say these things? Would your answer be? Your Honor, frankly, I would think in proceedings like this, it's always better to have counsel and the defendant present, because then you don't have an issue. I cannot conceive of a prosecutor consenting to this if he knew that the words in this transcript were going to be what the judge would say to this jury in the jury room in the absence of lawyers. I agree with that, Your Honor. Yeah, we start with that. You would never have consented to this as a responsible prosecutor to dump this issue into this lawsuit if you had known that this is what that judge was going to say. Now, are we going to say the defendant would have consented if he'd have known that? No. He probably is equal to you. He probably wouldn't consent either. So what does that tell us about the validity of the consent? Now, that's the problem. And then as far as I get the picture, this defendant moved for a mistrial just as soon as he learned about it, and that motion for a mistrial was denied. Then he resorts to requested instructions that was given. And you do not contend that by requesting an instruction, he somehow waived any position that he had, do you? No. No. That would only go into the total picture as to whether or not we can find this somehow to be harmless error, right? Well, Your Honor, we had a – I would submit that on this record, we had – if you look at the harmless error standard, we would submit that the record shows well beyond a reasonable doubt that there was – that the error was harmless. And if you look at the way this Court analyzed this issue in Frazin, where they had a similar situation where there was an ex-party contact that wasn't reported, there was no clarifying instruction given, there was no reminder that you shouldn't give up your beliefs simply to reach a unanimous verdict. In Frazin, it was found to be – where the judge told the jury to keep deliberating, it was found to be harmless beyond a reasonable doubt because of factors – the factors here are much stronger because there was a corrective instruction. And I might point out that not only did the judge remind the jurors in the corrective instruction on the same day, a few hours later, that they shouldn't – they shouldn't give up their views just – and he characterized everything he said before. It wasn't just one more thing he said at the time he said these other things. He said everything he said before – let me just tell you about what I said before, reaching back to what he said previously. I never meant to tell you you should give up your views to reach a verdict. And then he told them, and if you're deadlocked, come back and tell me you're deadlocked. Those – none of that happened in Frazin, where the court found that it was harmless beyond a reasonable doubt. In addition, in Frazin, I think the jury came back three and a half hours later. In this case, the jury came back a day later. And those were also factors for harmlessness beyond a reasonable doubt. And by the way, we did argue in our brief, contrary to what defense counsel says, we did argue that it was harmless beyond a reasonable doubt. We did rely on Frazin, and we did rely on this court's opinion in Rosales-Rodriguez. But I would also submit to you, if you're looking at harmless beyond a reasonable doubt, I would submit the fact that the judge instructed the jury, if you're deadlocked, come back and tell me you're deadlocked. That's what the jury did. The jury came back and told them they were deadlocked on practically, you know, 80 percent of the counts. Now, with respect also, just focusing a bit on Juror Row, the record here shows that there's no evidence that Juror Row was a holdout juror. And in fact, Juror Row stated before the judge said anything to the jury, and I cited this on page 16 of my brief, but it's in the transcript, there won't be resolution to a lot. That's before the judge said anything. Juror Row said there won't be resolution to a lot. We would submit that indicates that Juror Row contemplated there would be resolution to some. Something. And we would submit that's exactly what happened. There was resolution on 20 percent of the counts. The notion that the judge's instruction, whether certainly it would have been better, and I would agree with Your Honor that it would have been better had defendant and counsel been present in this circumstance, and this Court is clear that in these sorts of ex parte situations, it's important to have counsel and defendant present, at least counsel present. But in this situation, there's no evidence of coercion. There was evidently, even before the judge started talking to the jury, agreement as to some. And there's no case involving impermissible judicial coercion, where there are hung verdicts on 80 percent of the counts. We would submit it's clear beyond a reasonable doubt that this jury was very comfortable not reaching unanimity. And if they were comfortable before, because they hadn't when they talked to the judge, and then when the judge reminded them on the same day that, you know what, if you're hung up, you just come back and tell me you're hung up. Well, you know, a day later after they went home for the weekend, they came back, they deliberated another four hours, and they told the judge they couldn't reach verdicts on 45 out of 57 outstanding counts. So we would submit that, you know, given the fact that there was a corrective instruction that very close to the model corrective instruction, namely, don't give up your beliefs just to reach a verdict, that that was given the same day that the jury was instructed that they could return deadlock counts, that the jury, that there were over almost a full day from the time the offending comments occurred until the time that the verdict was returned, that there were selective verdicts, that on some of the same counts where co-defendants were charged, the jury hung as to one defendant and not as to another, we would submit we amply meet our burden of proving that it's harmless beyond a reasonable doubt. We would also submit, however, that as a legal matter, where setting aside the issue of waiver, as a legal matter, in Snyder versus Massachusetts, Justice Cardozo, analyzing the right to presence, stated, you know, when you're talking about proceedings after a trial, where there is no confrontation clause issue, and the right to presence is premised solely on the due process clause, that you need to look at the totality of the record. And we would submit, if you look at the totality of the record here, where the defendants indicated or voluntarily absented themselves from a colloquy between the judge and the jury. And then voluntarily absented themselves where the judge told the defendants and their counsel that he was going to be talking about the search for truth and justice. And then the judge had that conversation in a good faith, basically did what he told them he was going to do, but was somewhat concerned that, you know, he may have done something that was a little bit more than what the defense expected and immediately ordered a transcript, provided the defense with a transcript, and the defense on the same day had the opportunity to submit a corrective instruction, have them reminded that they could come back deadlocked, that that does not constitute a violation of the due process clause. On these facts, we would not concede that there was a violation of due process. And based on Snyder and based on United States v. Gagnon. But setting that aside, if the court found that there was a violation of due process, we would submit that we amply meet our burden of showing that whatever error occurred was harmless beyond a reasonable doubt. Yes. On the occasion when the defendant moved for a mistrial. Yes. The court denied that motion. Correct. In denying that motion, and in support of the denial of that motion, you do not have any of the arguments about how the instruction cured that. That is, the defendant's requested instruction. Should not we focus on that ruling? And if that ruling was correct when it was made, it's okay. If it was wrong when it was made, are you arguing that somehow by requesting the instruction and the court giving the instruction, that it somehow tempers whether or not that ruling is correct or not? Do you follow me? Let me. I'm talking about this defendant is faced with the reality that from his perspective the judge went beyond what he would ever have consented to. He moved for a mistrial. And the judge ruled. Now, that ruling can be right or wrong. But now you have the benefit of saying, well, everything is all right because this defendant, for whatever motive, in an effort to protect his rights or whatever he was trying to do, requested an instruction that the judge gave and cured everything. You follow me? Yes. Now, should we say to a defendant, if you want us to rule on whether or not that motion for mistrial is granted or denied erroneously, you better not request an instruction to repair anything because if by chance you repair something, it's going to take away from your right to assert that that ruling is wrong. Now, do you follow me? Yes. All right. Now, do you think that this defendant gave up anything by requesting that instruction and getting it? Waived anything? I don't think he waived anything. But I think, frankly, that the record, because the violation of the right to presence, which based on the due process clause in these circumstances, is analyzed under a harmless error of standard, as a strategic matter, had the defendant thought he had a slam dunk, he could have not requested a corrective instruction. And I think the record would have been better for him had he not done so. But I don't think the court should reach the issue now based on the record we have before. I think the law is clear. You have to analyze it under a harmless error standard. So you do not necessarily feel compelled to argue that the order denying the motion for a mistrial is correct? No, I believe it was correct. We argued that at the time because as we pointed out in our brief, first of all, there was an instruction that was given to begin with, which was conformed to Ninth Circuit model instruction, I believe 7.1 on the duty to deliberate. And we took the position that what the judge had done in the ex parte communication in any event was simply reminding them of their duty to deliberate. It wasn't an Allen charge in the worst form. They also were arguing on the principle focus, as I recall, and the court can obviously review the transcript now, but my recollection is the mistrial was based on the notion that the burden had shifted, which we believe the jury had been instructed on the burden correctly and didn't actually have to be instructed again on the burden. And the case law states that. Have I answered your question? Yes, you have. Could I just address very briefly the issue of restitution or is anybody? Yeah, go ahead. We would submit and we argued in our papers that the defendant, what the defense completely ignores is that this defendant was convicted of a conspiracy as well as numerous false statement counts and that the case law in the Ninth Circuit is clear. Well, first of all, the issue of restitution is governed by a standard of preponderance, so you don't just look at what the defendant was, what underlie the offenses of conviction. In this case, the judge's restitution order was based on an effort not to, we took the position below that the restitution should have been $8.4 million, which is the total amount the banks lost. The court elected not to go with $8.4 million, which it legally could have, and ended up with $3.1 million basically by parsing the total amount that was lost. The gross amount of the loan outstanding at the time the company went bankrupt was $13.3 million and it focused on borrowing-based certificates underlying the counts of conviction against which the banks borrowed basically about $5 million and then the court gave them credit for about 30 percent of that because at the end of the conspiracy, the banks recovered about 30 percent. So it took 60 percent of $5 million and came up with about $3 million. We think that was a perfectly reasonable determination of restitution and the restitution could have been ordered in the full amount because the defendant was convicted of the conspiracy, but the court used a reasonable method focusing just on the money's advance against borrowing-based certificates underlying counts of conviction. And, you know, as far as their emphasis on inventory and this and that, there's no basis for, first of all, there weren't any special verdicts on inventory. Secondly, under restitution, the court is entitled to consider conduct that isn't encompassed in the counts of conviction. There was ample evidence that the defendants lied about what was called the Brazil transaction. And counsel argues, for example, that even on the counts of conviction that there were no accounts receivable fraud with regard to that. Well, if you go back, the September 30, 1996, borrowing-based certificate also involved allegations of pre-billing, which was part of the accounts receivable fraud. Summary charts were submitted, which are part of our excerpt of record on that. On the December 31, 1996, borrowing-based certificate also involved pre-billing in amounts over $1 million. So it's not the judge, the court was neither required to simply consider B inventory based on what it actually did, nor under the law, because the judge can consider the full scope of wrongdoing encompassed by the conspiracy. So I don't know if that sort of condensed argument. All right. You take issue with the counsel's assertion that if the defendant had told the truth on every occasion, this company still would have been able to borrow everything but some $600,000. Is that right? Yes. We take significant issue with that. Significant issue with that. Yes. Okay. And part of that, and I think for the purposes of restitution, I mean, the judge actually cut out, based on a Rule 29 motion, two theories of the government's case, which the court could have considered and was entitled to consider, and we would submit the evidence supported, would have supported for the purposes of restitution. Thank you. Okay. Thank you very much. And do I get a review on my voice now? No, it's enthralling. I'll get you, you know, you can get a job as a, I don't know, in the opera or someplace. It's fine. Don't worry about it. But I'll give you the name of my voice coach, which I don't have. So maybe you'll give me one. May I have one minute, Your Honor? I'll make some quick points. Sure, sure. The cases on harmless error in this circumstance have found harmless error only where it could be said the instruction the judge gave was correct, and there's absolutely no reason to think that if counsel had been present, a different instruction would have been given. Can't possibly go there here. You can't get to harmless error. The standard we're talking about, which I don't think the government really grapples with, is no possibility of prejudice. That's the standard. You can't possibly get there. As an illustration of that, look at the way we're having to parse the remarks here to try and reconstruct the history and say there's no prejudice. Well, Juror Rose said there won't be decisions on a lot, and that means she thought there would be decisions on some things and not on other things, and therefore we can tell beyond reasonable doubt, mind you, that this had no impact on her. Well, we're putting an awful lot on a transcript of an informal conversation where early on we're all we know. She says, well, there ain't going to be agreement on a lot. What does that mean? We've already reached agreement on some things, and I think we are? It doesn't mean anything at all. We're badly divided. That's what this record shows. This is a badly divided jury on virtually every count here, and there's no possibility coming in saying we can tell beyond reasonable doubt this Court's instruction up close in person with the jurors had no impact. The Court's good faith is not in question. We've never questioned it. It's not remotely relevant to what the Court has to decide. I think Your Honor gets it right. It's a question of what did he do. You can see evidence in the record here. The Court understood it had departed from the script. The Court didn't say I may have departed from the script. It said the jurors may have departed from the script when they blurted something out, and I went off the script. That's what the Court said. The Court had participated in that colloquy. I don't think you need that because I think if you parse that colloquy, you will see the defense constantly saying, Your Honor, I don't think we need to talk about divisiveness. It's premature. I want to separate out talking about scheduling from talking about divisiveness. We don't want you to go there. There's all this colloquy. We focus down in the end to a preview the judge gives in one page. We got it. We got it, yeah. Would you like us to send this to a different trial judge? When it goes back? Yeah. We are not requesting that, Your Honor. You wouldn't want that, would you? Your Honor, I have reason to believe that Judge Sagasugi would not take a case this long at this point for health reasons. It's the kind of stuff one hears from clerks and in the community. So that's the only reason I pause as you say that. I've kind of been assuming that if we got back, the judge would feel like he couldn't. But if he could, that would be fine. That's the only reason I'm pausing. As a practical matter, I'm not certain that could happen. Judge Sagasugi has restricted and gotten rid of the clerk he had, which ran all these cases, who went somewhere else and hasn't been as active in recent time. So I don't know that he would do a jury trial this duration on remand. Well, that's up to him. All right. So if you want a completely new trial, you want to start at the beginning. Yes, Your Honor. We do think – maybe I should just clarify my answer to that. We do believe there is insufficiency on the SEC counts, that there was no evidence of materiality to the SEC. If that is correct, those counts couldn't be retried now, notwithstanding the sending it back as a result of the problem with the expert communication with the jurors. Yeah, I didn't – I didn't. As I understand it, that issue didn't come up. You didn't argue it at the beginning, and the SEC didn't get into it, or the U.S. Attorney's Office didn't get into it. I wasn't planning on going there. I was only making a comment that in our view, even if you sent it back for retrial, I think you have to decide that question as to whether there was a failure of the evidence. I was just curious. I was just curious. That's all. So what about this cross-appeal? I'm sorry, Your Honor. There's a cross-appeal? Is that what I hear? It's just on the sentencing. You know, this case came down, the sentence between Blakely and Burgess. It's the government's cross-appeal. Yes. That's right. The government's cross-appeal. I think both parties agree that if the convictions were affirmed, the case should be remanded for resentencing. The government's position is it should be remanded. It should not be. It should be an open remand. And I believe the defense's position is it should be a limited remand under Avalon. So that's the difference between the parties. Which may have no practical difference, we all understand. Especially if it's a different judge. Because if it's a different judge doing it. Oh, I don't think if it went back for resentencing, I don't think we'd go to a different judge. Well, I don't know. You're asking the question about trial. Judge Togsugi is still taking the case. I think it's somewhat. I think if the case were remanded for retrial, I don't know. I mean, I don't concur with the defense that Judge Togsugi wouldn't take the case. He'd already invested a huge amount of time in it. So I think that's completely unclear. I'm only reporting what I've heard. Well, I didn't mean to bring this subject up. I withdraw my question. Okay. I'm sorry. There you go. I withdraw my question. All right. Thank you very much. Thank you. We'll recess until 9 a.m. tomorrow morning.
judges: Pregerson, Leavy, Beistline